IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

JACQUELINE K. LAWTON,

Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

No. C11-0013

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  PRIOR PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     A.   Lawton's Education and Employment Background . . . . . . . . . . . . 6
     B.   Administrative Hearing Testimony . . . . . . . . . . . . . . . . . . . 6
          1.   Administrative Hearing on August 14, 2006 . . . . . . . . . . . 6
               a.   Lawton's Testimony . . . . . . . . . . . . . . . . . . . . 6
               b.   Vocational Expert's Testimony . . . . . . . . . . . . . . . 8
          2.   Administrative Hearing on January 20, 2009 . . . . . . . . . . 10
               a.   Lawton's Testimony . . . . . . . . . . . . . . . . . . . . 10
               b.   Vocational Expert Testimony . . . . . . . . . . . . . . . 11
     C.   Lawton's Medical History . . . . . . . . . . . . . . . . . . . . . . . 12

V.   CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . 19
     A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . 19
     B.   Objections Raised By Claimant . . . . . . . . . . . . . . . . . . . 21
          1.   Dr. Shaeffer's Opinions . . . . . . . . . . . . . . . . . . . 21
          2.   Lawton's Mental Impairments . . . . . . . . . . . . . . . . . 25
     C.   Reversal or Remand . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VII. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Jacqueline K. Lawton on February 7, 2011, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title XVI supplemental security income ("SSI") benefits.[1]  Lawton asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide SSI benefits.  In the alternative, Lawton requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

Lawton applied for SSI benefits on January 20, 2004.  In her application, Lawton alleged an inability to work since March 1, 2003, due to fibromyalgia, degenerative disc disease, chronic pain, spine curvature, and depression.[2]  Lawton's application was denied on March 25, 2004.  On August 25, 2004, her application was denied on reconsideration.  On November 1, 2004, Lawton requested an administrative hearing before an Administrative Law Judge ("ALJ").  On August 14, 2006, Lawton appeared with counsel, via video conference, before ALJ George Gaffaney for an administrative hearing.  In a decision dated November 21, 2006, the ALJ denied Lawton's claim.  The ALJ determined that Lawton was not disabled and was not entitled to SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy.  Lawton appealed the ALJ's decision.  On May 30, 2007, the Appeals Council denied Lawton's request for review.  Consequently, the ALJ's November 21, 2006 decision was adopted as the Commissioner's final decision.

On August 1, 2007, Lawton filed an action for judicial review in the Northern District of Iowa.  *See* case number 1:07-cv-00072-JSS.  The Commissioner filed an answer

---

[1] In 2004, when she initially filed her application for SSI benefits, Lawton's last name was Mojzis.

[2] At the administrative hearing in January 2009, Lawton amended her disability onset date to November 7, 2006.  *See* Administrative Record at 370.

on November 13, 2007. On May 23, 2008, the Court entered a ruling reversing and remanding the action for further proceedings, requiring the ALJ to fully and fairly develop the record. *See* docket number 14, in case number 1:07-cv-00072-JSS.

On January 20, 2009, Lawton appeared with counsel, via video conference, before ALJ Denzel R. Busick, for an administrative hearing on remand. Lawton and vocational expert Marian S. Jacobs testified at the hearing. In a decision dated May 11, 2009, the ALJ denied Lawton's claim.[3] The ALJ determined that Lawton was not disabled; and therefore, not entitled to SSI benefits because she was functionally capable of performing work that existed in significant numbers in the national economy during the relevant time period. Lawton appealed the ALJ's decision. On December 4, 2010, the Appeals Council

---

[3] The relevant time period for the ALJ's decision is November 7, 2006, Lawton's amended disability onset date, to March 6, 2008, the date Lawton was determined to be disabled and begin receiving SSI benefits. On March 6, 2008, while her initial application for SSI benefits was pending judicial review in this Court, Lawton filed a new application for SSI benefits. On August 6, 2008, the Social Security Administration awarded Lawton SSI benefits. *See* Administrative Record at 425-430. In summary, the ALJ's decision on remand considered the time period of November 7, 2006 to March 6, 2008, for determining whether Lawton was disabled at that time, and entitled to SSI benefits. In his decision, the ALJ specifically noted that:

> The undersigned does not find a basis for reopening [Lawton's] prior . . . Title XVI application. . . . Any discussion of medical evidence before the previous initial denials is merely for historical reference and not implied or constructive reopening of the prior applications. However, a note is made that [Lawton] has been determined eligible for Title XVI benefits in a subsequent filing as of March 6, 2008. Therefore the relevant period of this decision covers the time from the amended alleged disability onset date through the date of the subsequent application established onset date.

*See* Administrative Record at 370. Lawton agrees that the relevant time period for the ALJ's decision on remand is November 7, 2006 to March 6, 2008. *See* Lawton's Brief (docket number 13) at 13 ("The relevant time period in this case is from November 7, 2006, the amended onset date of disability, until March 6, 2008, the date Ms. Lawton was awarded benefits on a subsequent application.").

denied Lawton's request for review. Consequently, the ALJ's May 11, 2009 decision was adopted as the Commissioner's final decision.

On February 7, 2011, Lawton filed this action for judicial review. The Commissioner filed an answer on July 1, 2011. On August 4, 2011, Lawton filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that she was not disabled and that there was other work she could perform during the relevant time period. On October 3, 2011, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On April 18, 2011, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence."

*Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also

be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Lawton's Education and Employment Background

Lawton was born in 1953. She attended high school and finished the eleventh grade. She has not earned a GED. The record contains a detailed earnings report for Lawton. The report covers Lawton's employment history from 1986 to 2008. The earnings report provides that she had sporadic employment between 1986 and 2001. Her highest earnings were $2,485.24 in 1986. Lawton has no earnings since 2002.

### B. Administrative Hearing Testimony

#### 1. Administrative Hearing on August 14, 2006

##### a. Lawton's Testimony

At the administrative hearing, Lawton's attorney questioned Lawton about her physical health. When asked to describe her neck problems, Lawton explained that she gets severe headaches and "sometimes it just feels like my head's too heavy for my neck."[4] She also indicated that she suffers from low back pain. According to Lawton, her back pain makes it difficult for her to "stand very long at one time and I get a lot of numbness in my legs and my legs feel like they're floating a lot."[5] She testified that she lays on her side to relieve the pressure on her neck and back. Lawton's attorney also asked Lawton to describe her limitations with her hands. She testified that she cannot write or lift anything with her right hand. Lastly, Lawton's attorney asked her discuss her diagnosis of fibromyalgia. According to Lawton, the fibromyalgia causes her pain throughout her entire body, including constant tightness and achiness in her muscles and bones. She further explained that her fibromyalgia decreases her energy level and makes her feel tired all of the time. Lawton also testified that she has difficulty sleeping because

---

[4] Administrative Record at 331.

[5] *Id.* at 332.

she is constantly trying to get herself comfortable. She takes hot baths to alleviate the pain.

Next, Lawton's attorney questioned Lawton regarding her mental health. Lawton testified that she suffered from depression. According to Lawton, her depression caused a lack of motivation. Specifically, she testified that she was "down but I mean, I wouldn't be you know, with the pain I go through every day. I mean, my life is pretty limited you know. You're not going to be on top of the world when you know, you have to be careful where you go and what you do and so you don't fall down[.] . . ."[6]

When asked to describe her typical day, Lawton responded that she picks up the house everyday. She also indicated that she cooks and does the dishes. She testified, however, that a cleaning lady does the heavy cleaning, such as scrubbing the floors. According to Lawton, she spends about two hours everyday performing household chores, and the rest of the day she doesn't do "much of anything."

The ALJ also questioned Lawton. The ALJ asked Lawton whether she had any trouble with concentration or memory. Lawton answered that her short-term memory was bad and she had trouble with concentration. She attributed her difficulties with memory and concentration to a lack of good sleep. The ALJ asked her why she lacked good sleep. She responded:

> Because I hurt all night long and part of it is part of the depression. I've had trouble sleeping for a long time but I had trouble going to sleep and staying asleep but I take medicine to help me sleep but the fibromyalgia or whatever is hurting me. I have to get up and try to get the cramps out and stuff and so -- and I have to keep repositioning because I'll get -- if I stay in one spot too long I get very sore and then I got to try and lay another way. So, I'm -- you know, I don't get much peaceful sleep.

(Administrative Record at 341.) When asked whether she had any trouble standing or sitting, Lawton replied that standing is difficult because her legs get numb and she loses

---

[6] Administrative Record at 334.

control over them. She also testified that she cannot sit for more than one-half hour before she needs to get up and move around. According to Lawton, she also has difficulty climbing stairs. When asked whether she had anything else to say, Lawton replied:

> CLMT:   Yeah. You know, I really could have been without some of the pain if I'd have taken some of the more potent painkillers that were prescribed me. And because I worked so hard at getting my life straightened out and my sobriety I refused anything that had any narcotic in it because I feel I've come this far and I don't want to get hooked on painkillers in place of the alcohol. And so I go through the pain but it's still better than the way my life was before emotionally but I just would like to be able to see doctors regularly and get regular care so my quality of life can improve. This hurry up and waiting thing you know, when you wait for [(sic)] months for an appointment or three months for an appointment and you're still going through the same thing it's very hard.
>
> ALJ:    And the -- and when you talk about see the doctor and get regular treatment and the hold up there is simply the waiting time to get in to see the doctor?
>
> CLMT:   That and through the Iowa card there's so much red tape that you -- it has to all be preapproved and you know, so -- it's like with my hand, I waited from February until May to have anything -- you know, find anything out about that and we're still not even sure of that. Well, I'm going to see the neurologist or the neurosurgeon, so -- you know, it's just waiting and it doesn't help my anxiety you know. I just would like to go and get the care that I need.

(Administrative Record at 352-53.)

### b.    *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Roger Marquardt with a hypothetical for an individual with the following limitations:

> [The individual is able to lift up] to 50 pounds occasionally and 25 [pounds] frequently. Stand and sit six hours each in an eight-hour workday. Occasional ladder and stair climbing. Frequent balance, stoop, kneel, crouch and crawl. Frequent handling with the right hand. Frequent exposure to extremes of cold and to humidity and wetness. No exposure to hazards such as heights or moving parts. Simple, routine tasks with occasional changes in a routine work setting.

(Administrative Record at 349.) The vocational expert testified that under such limitations, Lawton could perform work as an office machine operator (860 positions in Iowa and 85,000 positions in the nation), order clerk (2,000 positions in Iowa and 275,000 positions in the nation), or retail maker/pricer (18,000 positions in Iowa and 1,500,000 positions in the nation). The ALJ provided the vocational expert with a second hypothetical with the same limitations, except that the individual could only lift 20 pounds occasionally and 10 pounds frequently. The vocational expert testified that the individual could perform the jobs described under the first hypothetical. The ALJ provided a third hypothetical which had the same limitations as the first hypothetical, except that the individual could only lift 10 pounds occasionally and 5 pounds frequently. The vocational expert testified that under such limitations, the individual would be limited to sedentary work with light strength demands.

Lawton's attorney also questioned the vocational expert. Lawton's attorney asked the vocational expert the following questions:

ATTY: . . . If the hypothetical person due to mental and/or pain symptoms would have to work at a slow pace up to one-third of the workday would they be employable?

VE: Not in the competitive job market, no.

ATTY: And due to pain and/or psychological symptoms if they needed to take additional work breaks more than normal allowed by employer to say two half-hour work breaks where they needed to lie down, elevate legs to get some pain relief would that be acceptable to an employer?

VE: It would not.

| ATTY: | So, would that eliminate the jobs you indicated were available in one and two? |
|-------|-------------------------------------------------------------------------------|
| VE:   | Yes. |
| ATTY: | And all other jobs? |
| VE:   | And all other full-time jobs, yes. |

(Administrative Record at 351-52.)

### 2.   *Administrative Hearing on January 20, 2009*

#### a.   *Lawton's Testimony*

At the second administrative hearing, Lawton's attorney asked Lawton to describe her back pain during the relevant time period in this matter. Lawton testified that her legs went numb "all the time" and she fell down a lot. She described her pain as "24/7." She estimated that she could only lift or carry 5 pounds at that time. She indicated that even lifting or carrying 5 pounds "would strain me."

Next, Lawton's attorney asked Lawton to discuss her psychological problems from the past 2-3 years. Lawton replied that "[w]ell, if I wasn't flying around, I mean, being manic and not being able to sleep more than two or three hours a night, then I'm way down in the dumps. I just can't get out of the depression."[7]

Lawton's attorney also inquired of Lawton whether at the end of 2006, she would have been able to perform a job eight hours per day, five days per week. Lawton answered that she could not have been employed in such a manner. Specifically, she testified that:

> I can't stand for more than five minutes for one thing. I can't sit for very long. I can't walk very far without sitting down, even in my own apartment. I walk to my bathroom and back, I have to sit down right away. I go to do the dishes. I can do them maybe five minutes and then I have to sit down. Sometimes I push the chair up to the sink and do the dishes. I'm not cooking like I did because I can't stand there and cook.

(Administrative Record at 651.)

---

[7] Administrative Record at 649.

### b. Vocational Expert Testimony

At the hearing, the ALJ provided vocational expert Marian Jacobs with a hypothetical for an individual who is able to:

> work at a light level of work, such that they could pick up 20 pounds occasionally, 10 pounds frequently, sit six hours out of an eight hour work day, stand and walk combined six hours, no limitation in the operation of hand controls, but able to climb stairs only occasionally. No ladders, scaffolds or ropes. While they can balance, crouch, kneel, stoop or crawl, they can do so only occasionally. No manipulation limits, no visual limits with proper corrective lenses. No communication limits. But they would have to avoid concentrated exposure to dust, fumes, odors, gasses, poor ventilation and hazards such as unprotected heights, fast or dangerous machinery. They're afflicted with pain and discomfort from a variety of sources that would produce mild to moderate chronic pain and discomfort noticeable to the person most of the time. With appropriate medication, however, they should be active within the limits I've described. They nonetheless would at all times likely have mild limits on their activities of daily living, mild up to moderate limits on their social functioning. Mild up to moderate limits on their concentration, persistence and pace such that they would become moderately limited towards the last one to two hours of an eight our [sic] work period. And the ability to interact appropriately with the general public, co-workers, accept criticism from supervisors or instruction from supervisors. And the ability to carry out detailed instructions. And in the ability to maintain extended concentration. And again, that would occur, generally the moderates would be reached the last one to two hours of most eight hour work periods primarily because of an increase in fatigue and pain as the day proceeds. Moderate means, as I'm using it, meaning that the ability to function in those areas would be noticeably affected but not totally precluded.

(Administrative Record at 657-58.) The vocational expert testified that under such limitations, Lawton could not perform her past relevant work. The vocational expert further testified that Lawton could perform the following work: (1) laundry folder (450 positions in Iowa and 35,000 positions in the nation), (2) motel housekeeping cleaner

(4,000 positions in Iowa and 338,000 positions in the nation), (3) assembler of buttons (256 positions in Iowa and 11,000 positions in the nation), and (4) document preparer of microfilming materials (1,500 positions in Iowa and 142,000 positions in the nation). Lawton's attorney also questioned the vocational expert. Lawton's attorney asked the vocational expert to consider the ALJ's hypothetical with the following additional limitations: (1) missing two to three days of work per month; (2) needing two to three additional breaks lasting 15 to 20 minutes during a regular work day; and (3) needing to work at a slow pace for one-third of the work day. The vocational expert testified that under such circumstances, the individual would be precluded from competitive employment.

### C. Lawton's Medical History

On November 30, 2005, Lawton was evaluated for depression by Ellen Natvig ("Natvig"), a physician's assistant at the Abbe Center for Community Mental Health ("Abbe Center") in Cedar Rapids, Iowa. Natvig noted that Lawton was hospitalized at Mercy Medical Center in Cedar Rapids, Iowa, on November 8, 2005 for suicidal thoughts. Natvig also reviewed Lawton's history of depression and depressive symptoms:

> [Lawton] states she has had problems with depression dating back to around age 20. She does believe she had depression as a child as well although was not officially diagnosed with anything. [Lawton] reports feeling 'miserable' and states she 'just exists.' She states that her mood is never just right -- its always either high or low. . . . She stated in the last month her mood has been low pretty much everyday. She also reports problems with sleep. She states that she falls asleep easily but wakes up frequently throughout the night. . . . She reports increased daytime fatigue. . . . [Lawton] reports difficulty with concentration. She states she usually reads quite a bit but has been unable to read and concentrate on reading materials in the last several months. . . . She reports decreased energy which has been going on for some time. [Lawton] states she is not currently suicidal and 'doesn't want to give up. . . .' She also reports problems with anxiety which has been going on for the last 6 months. . . . [Lawton] also reports increased irritability. She also reports problems with

> social anxiety and states starting in July 2005, she did not want
> to be around people very much and would avoid interactions
> with others. [Lawton] also reports a past history of some
> panic attacks that started 2 years ago when she went through
> menopause. She states that she has them every so often and
> has short periods of shortness of breath, chest pain, and
> nausea. She states sometimes she will wake up in the middle
> of the night and have difficulty catching her breath. . . .
> [Lawton] reports a past history of mood swings and unstable
> relationships. She reports she has feelings of abandonment.
> She also reports feeling empty and having no identity.

(Administrative Record at 291-92.) Natvig diagnosed Lawton with major depressive disorder and anxiety disorder. Natvig referred Lawton to an Abbe Center counselor for treatment.

On March 2, 2006, Lawton met with Karen Penick, LISW (Licensed Independent Social Worker) at the Abbe Center. Penick found Lawton's psychomotor activity to be mildly decreased and intellectual functioning to be in the average or slightly below average range. Penick noted that Lawton had passive death thoughts "because she feels so badly she thinks she would be better off not being here."[8] Penick further noted, however, that she denied any intent or plan to harm herself. Penick diagnosed Lawton with major depressive disorder, anxiety disorder, and borderline personality disorder traits. Penick recommended that Lawton continue medication management with Natvig and continue individual therapy as treatment.

On May 22, 2006, Lawton was evaluated by Dr. Rebecca Tuetken, M.D., for diffuse musculoskeletal pain and hand and leg numbness. Dr. Tuetken noted that Lawton had a long history of diffuse musculoskeletal pain and had been diagnosed with fibromyalgia. Dr. Tuetken also noted that Lawton had been increasingly bothered by hand numbness which affected all of her fingers and caused difficulty with grasping. Lawton further informed Dr. Tuetken that her legs become numb if she stands or walks for more than 5 minutes at a time. Upon examination, Dr. Tuetken found that Lawton's hand

---

[8] Administrative Record at 289.

closure was somewhat limited and her grip strength was reduced bilaterally. Dr. Tuetken also found "marked tenderness over the right thumb extensors and abductors and Finkelstein's sign for De Quervain's tenosynovitis was very positive, right more than left."[9] Dr. Tuetken also performed a radiograph examination and found spondylolisthesis at C3-C4 and disc narrowing at C5-C6 and C6-C7. Dr. Tuetken diagnosed Lawton with: (1) Long-standing fibromyalgia, (2) chronic neck and back pain with abnormal spinal curvature, cervical spondylolisthesis, disc narrowing, and degenerative joint disease, (3) bilateral hand numbness, (4) chronic low back pain,[10] (5) polyuria and polydipsia, (6) hypothyroidism, and (7) severe vitamin D deficiency. Dr. Tuetken recommended that Lawton see an occupational therapist and exercise regularly as treatment. Dr. Tuetken also prescribed ergocalciferol to help her vitamin D deficiency. Lastly, Dr. Tuetken requested an MRI of Lawton's C-spine to rule out cervical radiculopathy.

On June 21, 2006, Lawton met with Natvig for medication management. Lawton informed Natvig that she was depressed and had recently taken a handful of Trazodone in a suicide attempt. Lawton further informed Natvig that she was "'scared' of harming herself [and] . . . [felt] like she want[ed] to 'blow up' and get angry about things."[11] Lawton also reported that she was considering ways in which she could kill herself, including cutting her wrists. Natvig diagnosed Lawton with major depressive disorder, recurrent and anxiety disorder. Natvig noted that Lawton had "suicidal ideation and reports a plan of either cutting her wrists or taking an overdose of Trazodone."[12] Natvig concluded that Lawton needed to be hospitalized and advised Lawton's friend to take her to the St. Luke's Hospital Emergency Room in Cedar Rapids, Iowa.

---

[9] Administrative Record at 275.

[10] Dr. Tuetken noted, however, that "the exam did not reveal any significant muscle weakness or loss or change in reflexes." *Id.* at 276.

[11] *Id.* at 286.

[12] Administrative Record at 287.

Lawton was admitted to St. Luke's Hospital on June 21, 2006 for depression and suicidal thoughts. At St. Luke's, Lawton was treated with medications and supportive therapy. Over the course of her hospital stay, her mood improved and she started eating, feeling, and sleeping better. Lawton was discharged on June 26, 2006 as improved at her own request. Dr. Ali Safdar, M.D., recommended that Lawton continue taking medication and get regular mental health treatment at the Abbe Center.

On July 7, 2006, Lawton had an MRI of her cervical spine. The MRI showed degenerative changes in the cervical spine at C4-C5, C5-C6, and C6-C7. Specifically, the MRI showed "[m]ultiple level degenerative changes . . . with moderate left neural foraminal narrowing at C4-C5 and mild thecal sac narrowing and cord deformity, but no abnormal cord signal."[13] Dr. Tuetken concluded that although the MRI "is not normal, it is not clear that the changes seen here can account for her symptoms."[14]

On November 7, 2006, Lawton met with Dr. Jeffrey M. Clark, M.D., seeking relief for low back pain. Dr. Clark noted that Lawton's pain extended from her low back down both of her legs. Upon examination, Dr. Clark found Lawton's back to be "largely unremarkable" with mild to moderate tenderness in the low lumbar region. Dr. Clark further found that her leg strength was grossly normal, her reflexes were intact, and she had full range of motion. Dr. Clark diagnosed her with low back pain with some proximal left-sided radicular symptoms and evidence of spondylolisthesis of the lumbar spine. Dr. Clark recommended a trial epidural steroid injection as treatment, and the injection was administered that day. On December 14, 2006, Dr. Clark administered a transforaminal steroid injection to provide greater low back pain relief than the epidural

---

[13] *Id.* at 281.

[14] *Id.*

steroid injection performed on November 7, 2006.[15]  On January 2, 2007, Lawton received a third injection for low back pain relief.

On February 28, 2007, Lawton had a follow-up appointment with Dr. Tuetken. Dr. Tuetken noted that:

> [Lawton] reports some improvement in hand pain with less numbness and tingling. Also some decrease in neck pain since undergoing physical therapy. However, her diffuse musculoskeletal pain remains unchanged and remains bothersome. She has frequent muscle cramps throughout the day and at night. Nighttime cramps greatly disturb her sleep. She is chronically fatigued. She remains depressed.

(Administrative Record at 313.) Upon examination, Dr. Tuetken found Lawton to be tearful and depressed. Her musculoskeletal exam revealed good neck range of motion; full shoulder, elbow, wrist, and finger range of motion; good hip, knee, and ankle movement; normal strength throughout; and diffuse tenderness consistent with fibromyalgia. Dr. Tuetken diagnosed her with:  (1) Muscle cramps, (2) chronic sleep disturbance, secondary to muscle cramps, (3) depression, (4) vitamin D deficiency, (5) hypothyroidism with chronically elevated TSH, (6) fibromyalgia, secondary to 1-5, and (7) hypokalemia. Dr. Tuetken prescribed ergocalciferol to help her vitamin D deficiency, recommended she take a daily calcium supplement, and urged to be compliant with her synthroid medication as treatment.

On July 24, 2007, Lawton was admitted to the University of Iowa Hospitals and Clinics ("UIHC") for a depressive episode. Specifically, Lawton reported that:

> [she] was apparently doing well until about 2 weeks ago, when she began to feel depressed and felt that she couldn't cope with life. This has been steadily getting worse and the only triggers she can identify are her fibromyalgia pain, hr [sic] migraines which have been getting worse over the past week, and her relationship with her significant other which she feels is not

---

[15] According to the December 14, 2006 Operative Report, the epidural steroid injection gave Lawton about two and one-half weeks of low back pain relief. *See* Administrative Record at 304.

going too well. She attempted suicide three days ago, by taking a handful of her Trazodone 100 mg pills. She also tried to cut her arms last week. . . . She feels hopeless, and angry with her spouse. . . . She has lost interest in a lot of activities and all she wants to do [] is lie in bed all day. She feels drained of energy and tired all the time. [H]er appetite has remained fine and she doesn't have any guilty thoughts. [H]er sleep habits have changed and she sleeps more than usual.

(Administrative Record at 506.) Doctors diagnosed Lawton with major depressive disorder, somatization disorder, fibromyalgia, degenerative disc disease, migraines, and seizure disorder. Doctors also noted that she had moderate stressors, including pain from fibromyalgia, degenerative disc disease, and feeling unneeded by people. Lawton was treated with medication. Lawton's mood "gradually improved throughout her hospital stay," and she no longer had suicidal ideation.[16] She was discharged from the UIHC on August 1, 2007.

On May 20, 2008, Lawton was referred by Disability Determination Services ("DDS") to Dr. Audrey R. Shaeffer, D.O., for a consultative examination. Dr. Shaeffer noted that Lawton had diagnoses of fibromyalgia and degenerative disc disease. Lawton reported to Dr. Shaeffer that:

her pain is usually an 8 on a scale of 1 to 10. It only improves to a 4, if she takes two Hydrocodone and it does go up to a 10. She states her pain is everywhere and increased with standing and made better with lying on her side.

(Administrative Record at 575.) Lawton also reported difficulty with sleeping due to pain, restless legs, anxiety, and depression. Lawton described her daily activities as follows:

She gets up between 4:30 and 5:30 a.m. and spends her day reading, watching television, cleaning, and attending groups at the Abbe Center. . . . She is able to do her own self-care and personal hygiene. She has increased pain with standing, sitting, walking, climbing stairs, lifting, pushing and pulling, and grasping. She goes to bed between 10:00 an [sic] 11:00 at night.

---

[16] *See* Administrative Record at 508.

(Administrative Record at 576.) Upon examination, Dr. Shaeffer found that Lawton could: (1) lift and carry 10 pounds occasionally; (2) push and pull 20 pounds occasionally; (3) occasionally stand; (4) rarely walk, stoop, bend, or climb stairs; and (5) never crawl, kneel or climb ladders.

On June 6, 2008, Dr. Herbert Notch, Ph.D., reviewed Lawton's medical records and provided DDS with a Psychiatric Review Technique assessment for Lawton. On the Psychiatric Review Technique assessment, Dr. Notch diagnosed Lawton with major depressive disorder and anxiety disorder. Dr. Notch determined that Lawton had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.

On July 7, 2008, Dr. Nalini Tella, M.D., reviewed Lawton's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Lawton. Dr. Tella determined that Lawton could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for about six hours in an eight-hour workday, (4) sit with normal breaks for about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Tella also determined that Lawton could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Tella found no manipulative, visual, communicative, or environmental limitations. Dr. Tella concluded that:

> [Lawton] has received treatment for chronic back pain, neck pain, fibromyalgia, and depression at University of Iowa hospitals. She has had radiological evidence of degenerative disk disease of cervical spine and lumbar spine and clinical diagnosis of fibromyalgia in 2006. She had seen multiple specialists including rheumatologist, and neurosurgeon for evaluation and treatment of her symptoms. There appears to be a strong correlation of her somatic symptoms with her emotional status and depression. . . .

> [Lawton] underwent a consultative examination in 5/08, which showed normal range of motion of all joints including lumbar and servical spine. She had a slow gait, and had normal strength of upper and lower extremities. There was no sensory deficit. It is of note that she has only four tender points for fibromyalgia with negative control points.

(Administrative Record at 604.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Lawton was not disabled during the relevant time period for this action. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The five steps an ALJ must consider are:

> (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix"); (4) whether the claimant can return to [his or] her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.

*Moore*, 572 F.3d at 523 (citation omitted). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005), in turn quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).

In order to establish a disability claim, "[t]he claimant bears the burden of demonstrating an inability to return to [his or] her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to "show [that] the claimant is capable of performing other work." *Id.* In

order to show that a claimant is capable of performing other work, the Commissioner must demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "'It is the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Lawton had not engaged in substantial gainful activity since January 20, 2004. At the second step, the ALJ concluded from the medical evidence that Lawton had the following severe combination of impairments: degenerative disc disease of the cervical and lumbar spine, fibromyalgia, uncontrolled hypothyroidism, hypertension, obesity, depression, and a history of alcohol abuse. At the third step, the ALJ found that Lawton did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Lawton's RFC as follows:

> [Lawton] has the residual functional capacity to perform light work . . . in that [she] is capable of carrying/lifting twenty pounds occasionally and ten pounds frequently, can sit for six hours of an eight hour day, and can stand/walk for six hours of an eight hour day. [Lawton] has no limits on the operation of hand controls or manipulations limits. She can occasionally climb stairs, and occasionally balance, stoop, crouch, kneel, and crawl. [Lawton] should avoid hazards, such as fast and dangerous machinery and unprotected heights, avoid concentrated exposure to dust, fumes, odor, gasses, poor ventilation, and should never climb ropes/ladders/scaffolds. Pain and discomfort would be mild to moderately noticeable at

all time, but with medications [s]he can be active as described; [Lawton] would have mild limits on activities of daily living, while social functioning and concentration, persistence, and pace would be mildly to moderately limited. These moderate limitations would occur toward the last 1-2 hours of an eight hour workday due to fatigue and pain, affecting her ability to interact with the public and coworkers, accepting instruction/criticism from supervisors, carry out detailed instructions, and maintain extended concentration—'moderate' restrictions meaning noticeably affected but not totally precluded.

(Administrative Record at 375.) Also at the fourth step, the ALJ determined that Lawton could not perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Lawton could have worked at jobs that exist in significant numbers in the national economy during the relevant time period. Therefore, the ALJ concluded that Lawton was not disabled.

### B. Objections Raised By Claimant

Lawton argues that the ALJ erred in two respects. First, Lawton argues that the ALJ failed to properly consider the opinions of a consultative examiner, Dr. Shaeffer. Second, Lawton argues that the ALJ's finding that her mental impairments produced only "mild to moderate" limitations is not supported by substantial evidence.

### 1. Dr. Shaeffer's Opinions

Lawton argues that the ALJ erred by failing to adequately evaluate the work-related limitations imposed by Dr. Shaeffer, a consultative examining physician. Specifically, Lawton argues that in making his RFC determination, the ALJ should have considered the limitations provided in Dr. Shaeffer's consultative examination report. Lawton points out that Dr. Shaeffer's assessment of her limitations in more restrictive than the ALJ's RFC assessment. Lawton concludes that "Dr. Shaeffer's evaluation is the best evidence of [her]

condition and work-related limitations. The ALJ refused to consider the report at all. This is error."[17]

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Furthermore, when an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697(citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

---

[17] Lawton's Brief (docket number 13) at 17.

Here, unlike the ALJ's RFC assessment, Dr. Shaeffer found that Lawton could: (1) lift and carry 10 pounds occasionally; (2) push and pull 20 pounds occasionally; (3) occasionally stand; (4) rarely walk, stoop, bend, or climb stairs; and (5) never crawl, kneel or climb ladders. The ALJ, however, did not address Dr. Shaeffer's opinions because Dr. Shaeffer's opinions lapsed "into the period which [Lawton] was paid benefits on a subsequent application, and is therefore irrelevant to the time period for this decision."[18] The Court is unconvinced by this line of reasoning. Dr. Shaeffer examined Lawton on May 20, 2008. On August 6, 2008, the Social Security Administration determined that Lawton was disabled as of March 6, 2008, on a subsequent application for SSI benefits, and granted benefits beginning on that date. Thus, Dr. Shaeffer examined Lawton less than three months after the date she was determined to be disabled on a subsequent application. Significantly, Dr. Shaeffer stated that she based her opinions on "the available information at this time, including the history given by the examinee, the medical records and tests provided, and the physical findings."[19] Moreover, there is no evidence in the record which suggests Lawton suffered a traumatic injury or accident prior to, or between March 6, 2008 and May 20, 2008; or that her health significantly deteriorated prior to, or between May 6, 2008 and May 20, 2008. Under these circumstances, the Court believes that Dr. Shaeffer's opinions are relevant to time period of the ALJ's decision, and should have been considered by the ALJ in his RFC assessment for Lawton. *See Guilliams*, 393 F.3d at 803 (providing that an ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence). Interestingly, the ALJ's RFC is very similar to a physical RFC provided to DDS by a non-examining doctor on July 8, 2008, *two* months later than Dr. Shaeffer's opinion, and *four* months after she was determined to be disabled.[20]

---

[18] Administrative Record at 378.

[19] *Id.* at 579.

[20] *See* Administrative Record at 597-604.

Even more disturbing to the Court is the ALJ's complete disregard of this Court's orders on remand, where the Court required the ALJ to:

> develop the record fully and fairly with regard to the opinions of Drs. Tuetken and Bauer. Specifically, the ALJ shall explain the reasons for his determination that [Lawton's] RFC included the ability to "frequently handle" with her right hand in relation to Dr. Tuetken's findings regarding [Lawton's] hand problems. The ALJ should also fully develop the record on the issue of [Lawton's] fibromyalgia diagnosis and recontact Dr. Tuetken to seek clarification of the reasons and medical evidence which support her determination that [Lawton] suffers from fibromyalgia. Lastly, the ALJ should explain his reasons for accepting or rejecting Dr. Bauer's opinions and explain his own findings with regard to [Lawton's] mental capabilities, including social functioning and her ability to maintain concentration, persistence or pace.

*See* docket number 14, in case number 1:07-cv-00072-JSS at 28. Nowhere in the ALJ's decision does he explain his reasons for accepting or rejecting the opinions of Drs. Tuetken and Bauer. The ALJ simply refers to some of Lawton's history with Dr. Teutken, and doesn't even bother to mention Dr. Bauer at all. Apparently, the ALJ decided to ignore the Court's directions on remand because he did not discuss the specific issues of Lawton's hand problems and fibromyalgia as they relate to Dr. Tuetken's opinions, or Lawton's mental capabilities as they relate to Dr. Bauer's opinions. Additionally, the ALJ failed to recontact Dr. Tuetken as ordered by this Court. By failing to address Dr. Shaeffer's opinions and the opinions of Drs. Tuetken and Bauer as directed by this Court on remand, the Court finds the ALJ's RFC assessment for Lawton to be wholly inadequate, and questions its basis on any substantial evidence in the record as a whole. Not only is the ALJ's decision wholly inadequate, but by failing to address the concerns of this Court on remand, the ALJ not only wasted his time and the time of the Social Security Administration, but also wasted the time of the Court, and most importantly, the time of the claimant, who initially filed her application for SSI benefits in January 2004, over eight years ago. The Court finds the actions of the ALJ to be unacceptable.

### 2. *Lawton's Mental Impairments*

Lawton argues that the ALJ's findings that her mental impairments produce only "mild to moderate" limitations is not supported by substantial evidence. The Commissioner argues that the ALJ "appropriately analyzed [Lawton's] mental impairments in accordance with the regulations and substantial evidence supports the resulting findings."[21] While the ALJ reviewed at least some of Lawton's mental health record, he offers no explanation of his conclusions regarding Lawton's mental impairments.[22] The Court finds this particularly problematic because on remand, the Court specifically directed the ALJ to "explain his own findings with regard to [Lawton's] mental capabilities, including social functioning and her ability to maintain concentration, persistence or pace."[23] Additionally, the Court ordered the ALJ to address the opinions of Dr. Bauer, a psychological consultant, who provided a mental RFC assessment for Lawton. Not only did the ALJ fail to address Dr. Bauer's opinions, but he failed to even mention Dr. Bauer in his decision. Again, the Court finds that ALJ's actions to be entirely unacceptable, and questions whether the ALJ's RFC assessment with regard to Lawton's mental limitations is based on any substantial evidence in the record as a whole. *See Gates*, 627 F.3d at 1082 (A court will only "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole.").

### C. *Reversal or Remand*

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings
> and transcript of the record, a judgment affirming, modifying,
> or reversing the decision of the Secretary, with our without
> remanding the cause for a rehearing.

---

[21] Commissioner's Brief (docket number 14) at 11.

[22] *See* Administrative Record at 377-78.

[23] Docket number 14, in case number 1:07-cv-00072-JSS at 28.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). Here, the ALJ has twice had the opportunity to address Lawton's claims of disability, and both times the ALJ has failed to support his decision with substantial evidence on the record as a whole. Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Gates*, 627 F.3d at 1082. The Court finds that a reasonable person would not find the ALJ's reasoning adequate to support his determination. Therefore, while it is a close call whether the total record "overwhelmingly" supports a finding of disability, the Court believes that the scale tips in favor of Lawton because (1) she has already been deemed disabled as of March 6, 2008, and (2) the ALJ failed to fully and fairly develop the record in his initial decision, and on remand. The Court is skeptical that a second remand would provide different results. Accordingly, the Court finds that on the record before it, Lawton is entitled to SSI benefits for the period of November 7, 2006 to March 6, 2008.

## VI. CONCLUSION

The Court concludes that this matter should be reversed and remanded to the Commissioner for calculation of benefits. The ALJ failed to base his RFC assessment on all the relevant evidence. Moreover, the ALJ has twice failed to fully and fairly develop the record in ths matter, and twice failed to base his decision on substantial evidence in the record as a whole. Therefore, the Court finds that Lawton is entitled to SSI benefits.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), to calculate and award benefits to Lawton, for the time period of November 7, 2006 to March 6, 2008.

DATED this ___9th___ day of February, 2012.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA